IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| ALVENA C. HEGGINS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:16-CV-977 |
| CITY OF HIGH POINT, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiff, Ms. Alvena Heggins, sued her former employer and supervisors, the City of High Point, City Manager Greg Demko, and Deputy City Manager Randy McCaslin, alleging that they violated her First Amendment rights, discriminated against her on the basis of race, and retaliated against her for participating in civil rights activities. Because Ms. Heggins' speech was not protected under the First Amendment and because she has not advanced evidence to support her Title VII or § 1983 claims, the Court will grant the defendants' motion for summary judgment.

### FACTS[1]

Ms. Heggins was the Director of the Human Relations Department for the City of High Point until October 2015.[2] Doc. 31-8 at ¶ 3. Ms. Heggins is African-American.

---

[1] The Court summarizes the evidence in the light most favorable to Ms. Heggins, the non-moving party.

[2] In her affidavit, Ms. Heggins asserts that she began working for the City in 2004, Doc. 31-8 at ¶ 3, but her amended complaint says she began in 2003. Doc. 18 at ¶ 9.

Mr. Demko, the City Manager, and Mr. McCaslin, the Deputy City Manager, are white. Doc. 31-8 at ¶ 4.

The Human Relations Department worked to foster good relations between the City and its citizens. Doc. 28-9 at ¶ 3. Before the events leading to her firing, Ms. Heggins' job performance was satisfactory. Doc. 31-8 at ¶¶ 5-7.

In late 2014 and early 2015, Ms. Heggins organized a series of forums designed to build trust between the black community and the City's police. Doc. 28-2 at 11-15, 53-55; Doc. 28-9 at ¶ 6. She planned these events, denominated as "Black and Blue Forums," as part of her work for the City. Doc. 28-2 at 11; Doc. 28-9 at ¶ 6.

To promote the third Forum in March 2015, Ms. Heggins sent two emails, including an attached flyer, to a large listserv of recipients. Doc. 28-9 at ¶ 6; Doc. 28-2 at 100-08. The flyer described the event as: "Police Accountability & Citizen Oversight: A Framework for Dismantling White Supremacy and Establishing Real Justice in the 21st Century." Doc. 28-2 at 104, 108. Other local institutions also co-sponsored the event. Doc. 31-8 at ¶ 9. Some City Council members and citizens interpreted the flyer as implying that the City's police force had a white supremacy problem and objected to the City's sponsorship of such an event. *See* Doc. 28-4 at 6-7.

In the aftermath of this controversy, the City's African-American Human Resources Director, Ms. Angela Kirkwood, explained to Ms. Heggins why the term "white supremacy" was offensive in context. Doc. 28-9 at ¶ 7. Ms. Heggins also had a "corrective interview" with Mr. Demko. Doc. 31-8 at ¶ 16(b). Ultimately, Mr. McCaslin

2

gave Ms. Heggins a verbal warning for her role in the Forum. Doc. 28-2 at 67-68; 109.[3]
Shortly after this warning, Ms. Heggins filed an Equal Employment Opportunity
Commission charge in May 2015, alleging race discrimination and retaliation.[4] Doc. 28-9 at ¶ 9; Doc. 18 at ¶ 25.

In the early summer, while the EEOC charge was pending, Ms. Heggins sent an email to Mr. Demko, Mr. McCaslin, and others stating that she was "in fear for [her] very life and the life of [her] coworker, Mr. Lowe[]" because of her work. Doc. 28-2 at 112-13 (Ms. Heggins' email). Although she mentioned no specific threat, the City investigated her fears and placed Ms. Heggins on paid administrative leave while the investigation was pending. Doc. 28-7 at ¶ 6. Ms. Heggins refused to talk to the investigator without her attorney, Doc. 28-2 at 111, the investigation was closed, and Ms. Heggins returned to work. *See* Doc. 28-7 at ¶ 6; Doc. 28-2 at 79-80.

On July 27, 2015, Ms. Heggins wore a sign protesting discrimination and unfair treatment to a department head meeting and placed a similar sign in her department's office interior window. Doc. 28-2 at 86-87; Doc. 28-9 at ¶ 11, 31-2 at 5-6. Mr. McCaslin directed Ms. Heggins to take down the window sign because it created a "tense and uncomfortable work environment" and made other employees uneasy, Doc. 31-2 at

---

[3] In her deposition, Ms. Heggins agreed with the City that this was a verbal warning. In her later-submitted affidavit, she says it was a verbal and written warning. As Ms. Heggins herself recognizes in the affidavit, she cannot create a disputed question of fact by contradicting her deposition testimony in her affidavit. *See* Doc. 31-8 at ¶ 2.

[4] The May 2015 EEOC charge itself is not in the record. In her amended complaint, Ms. Heggins states that she asserted retaliation and discrimination in that charge, Doc. 18 at ¶ 25, and the defendants have not disputed this fact.

7; Doc. 28-9 at ¶ 11, and verbally warned her about engaging in disruptive conduct. Doc. 31-2 at 7 (memo documenting the verbal warning).

In August 2015, a City Councilman complained that Ms. Heggins had accosted and harassed him when he came out of a Committee meeting, Doc 28-9 at ¶ 12, and a Major in the City's police force reported that Ms. Heggins had made public comments reasonably interpreted as accusing Mr. Demko of condoning displays of swastikas. Doc. 28-8 at ¶ 11; Doc. 28-8 at 11-12 (Major Steele's letter). Ms. Heggins contended then and now that she did not accost a City Councilman, disparage Mr. Demko, or otherwise act inappropriately. Doc. 31-3 at 28; Doc. 31-8 at ¶¶ 13, 15. After an investigation and because she had already been given two verbal warnings for similar behavior, Mr. McCaslin suspended Ms. Heggins for six days without pay in September 2015. Doc. 28-8 at ¶ 12; Doc. 28-8 at 14 (suspension letter); Doc. 28-9 at 7-8 (investigation summary).

Within 24 hours of returning to work from this suspension, Ms. Heggins argued with the Human Resources Director, Ms. Kirkwood, about her work plan. Doc. 28-9 at ¶ 14. She also called Ms. Kirkwood a "liar" and questioned her work ethic. *Id.*

In October 2015, Mr. McCaslin concluded that Ms. Heggins' pattern of inappropriate and discourteous behavior had not improved, and he fired her. Doc. 31-3 at 30 (termination letter); Doc 28-8 at ¶ 13. The City hired an African-American female, Ms. Fonta Dorely, to replace Ms. Heggins.[5] Doc. 28-7 at ¶ 7.

---

[5] After Ms. Heggins' termination, the functions of the Human Relations Department were transferred under the City's Department of Communications and Public Engagement. Doc. 28-7 at ¶ 7. Jeron Hollis is the director of this department. Doc. 28-10 at ¶¶ 1, 3. The defendants

After being fired, Ms. Heggins filed another EEOC charge, asserting only retaliation. Doc. 28-9 at ¶ 16.[6] She filed this action in July 2016. Doc. 1.

## ANALYSIS

Summary judgment should be granted if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300-01 (4th Cir. 1998) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### I. The First Amendment Retaliation Claim

Ms. Heggins contends that the defendants retaliated against her for distributing the flyer, in violation of her First Amendment rights. Doc. 18 at ¶ 37; Doc. 31 at 17-18. She contends that she was first reprimanded and then terminated because of this protected speech. Doc. 31-8 at ¶ 16(b)-(d); Doc. 31 at 5.

The First Amendment protects both the affirmative right to speak and the right to be free from a public official's retaliation for exercising that right. *Adams v. Trs. of the*

---

assert, and the plaintiff does not contest, that Mr. Hollis is an African-American male. *See* Doc. 28 at 8. Accordingly, while Ms. Dorely does not have Ms. Heggins' exact job title, she manages the functions of Ms. Heggins' former department. Doc. 28-7 at ¶ 7.

[6] The actual EEOC charge is not in the record, but Ms. Heggins has not disputed Ms. Kirkwood's testimony that this charge asserted only retaliation.

*Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). While "public employees do not surrender all their First Amendment rights by reason of their employment," *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), the government "as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000).

Thus, a district court must balance the interests of a public employee, "as a citizen, in commenting upon matters of public concern" against those of the government, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Adams*, 640 F.3d at 560. To balance those interests in the context of a retaliation claim, courts undertake a three-step inquiry:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's adverse employment decision.

*Id.* at 560-61.

Public employees who make statements "pursuant to their official duties" are not speaking as citizens for First Amendment purposes and their speech does not warrant constitutional protection. *Garcetti*, 547 U.S. at 421; *see Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647 (7th Cir. 2006) ("*Garcetti* . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking as a citizen or as part of her public job.").

6

Here, the record shows that Ms. Heggins distributed the flyer as part of her official responsibilities. She was employed as the Director of the Human Relations Department, the purpose of which was "to foster good relations between the City and its citizens." Doc. 28-9 at ¶ 3. Her concept for the Forum—"build[ing] trust between the African American community and the police department," Doc. 28-2 at 3—fell squarely within her Department's purpose. *See* Doc. 28-9 at ¶ 3. Ms. Heggins testified at her deposition that she was acting in her capacity as the director of the Human Relations Department, Doc. 28-2 at 11, when she "organized [the F]orum to be sponsored by [the] City of High Point." Doc. 18 at ¶ 14. She also acknowledges that in her role as the Director of the Human Relations Department, she recruited the members of the committee that planned the Forum's agenda and program, Doc. 28-2 at 12-14; that "[t]he human relations department was responsible for coordinating [the Forum]", Doc. 28-2 at 14; and that she could have refused to use any topic in the Forum that was not "related to what the community group was trying to achieve." Doc. 28-2 at 17. She sent the flyer as an attachment to two emails that appear to have been sent for the purpose of promoting the Forum. Doc. 28-2 at 100-108. Both emails contained an "email signature" identifying Ms. Heggins as the "City of High Point[,] Human Relations Director," and indicating that replies should be sent to her email address with a domain name of "@highpointnc.gov." Doc. 28-2 at 102, 107. Finally, the emails from Ms. Heggins notify recipients that replies sent to Ms. Heggins' email address would be subject to North Carolina public records law. Doc. 28-2 at 102, 107.

In sum, the uncontradicted evidence shows that Ms. Heggins disseminated the flyer in her capacity as the Director of the Human Relations Department. Accordingly, she "has no First Amendment cause of action based on . . . [her] employer's reaction to the speech," *Garcetti*, 547 U.S. at 418, and summary judgment is appropriate on this claim.[7]

II. **Title VII and Section 1983 Claims for Race Discrimination**

Ms. Heggins also contends that the defendants discriminated against her on the basis of race, violating Title VII and her equal protection rights. Doc. 18 at ¶¶ 37-38, 42. It appears from her briefing that Ms. Heggins' race discrimination claim is based solely on the City's decision to discharge her.[8] *See* Doc. 31 at 22.

Ms. Heggins identifies two pieces of evidence supporting her claim that the City discriminated against her on the basis of race. First, Ms. Heggins points to Ms. Kirkwood's statement that the term "white supremacist" is equally offensive as the word

---

[7] Ms. Heggins' complaint is not specific as to the protected speech which caused the alleged retaliatory conduct. *See* Doc. 18. Her brief in opposition directly asserts that this claim is based on her distributing the white supremacy flyer. Doc. 31 at 18. To the extent she also contends that it was her participation in and organization of the Forum that resulted in the defendants' alleged retaliation, *see* Doc. 31 at 12-18, her argument is without merit for the same reasons: the record shows without contradiction that Ms. Heggins' participation in the Forum was pursuant to her official duties. *See* discussion *supra* Part I. Therefore, she also has no First Amendment cause of action based on her employer's reaction to her involvement in the Forum. *See Garcetti*, 547 U.S. at 418.

[8] To the extent Ms. Heggins contends the warnings she received before her termination constitute discrimination, that claim is without merit. To prevail on a Title VII race discrimination claim, "the existence of some adverse employment action is required." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Id.* This must result in some "significant detrimental effect" like a decrease in compensation, career prospects, job title, or opportunity for promotion. *Id.* Here, there is no evidence that the warnings carried any consequences of this nature.

"nigger." Doc. 28-9 at ¶ 7. This remark, however, cannot reasonably be interpreted to reflect a discriminatory attitude, as it is undisputed that Ms. Kirkwood made it while explaining to Ms. Heggins why using the term "white supremacy" in the flyer was offensive to some readers. Ms. Heggins also identifies a remark by City Councilman Mr. Davis during the flyer controversy that she should be fired for "race baiting" as evidence that she was fired based on her race. Doc. 31-8 at ¶ 16(a). Ms. Heggins, however, does not claim that she heard the "race baiting" remark and points to no admissible evidence that it was made. *See id.*; Fed. R. Civ. P. 56(c)(4); *Evans v. Techs. Applications Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("Summary judgment affidavits cannot be conclusory or based upon hearsay."). Nor does using the phrase "race-baiting" equate to racial discrimination. In any event, neither Ms. Kirkwood nor Mr. Davis was Ms. Heggins' employer or supervisor, and Ms. Heggins has not shown that the City acted on these remarks, both of which were allegedly made many months before she was terminated. Doc. 31-8 at ¶ 16(a); Doc. 28-9 at ¶ 7; *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) (direct evidence of discrimination requires "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."). She has not proffered any evidence of name-calling, derogatory statements or comments, or other similar conduct directly or circumstantially indicative of discrimination.

Nor has Ms. Heggins established a prima facie case of discrimination under the *McDonald Douglas* burden shifting framework. To establish a prima facie case of

9

discriminatory treatment, she must show (1) she is a member of a protected class, (2) satisfactory job performance, (3) she suffered an adverse employment action, and (4) different treatment from similarly situated employees outside the protected class. *See Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010).[9] As a general rule, Ms. Heggins must also show that a member of a non-protected class filled her position. *See, e.g., Miles v. Dell, Inc.*, 429 F.3d 480, 486-88 (4th Cir. 2005). If she establishes a prima facie case, the City may rebut Ms. Heggins' prima facie case with a legitimate, non-discriminatory reason for the adverse employment action; if the City offers such evidence, Ms. Heggins must show by a preponderance of the evidence that the City's reason is pretextual. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007).

Ms. Heggins has shown that she is a member of a protected class and that her termination was an adverse action. *See Coleman*, 626 F.3d at 190. She has not, however, shown that she was treated differently from "similarly situated employees outside the protected class." *Id*. She offers no evidence that another employee engaged in similar conduct and avoided discipline or was disciplined less severely. Additionally, her replacement was also an African-American female. *See Miles*, 429 F.3d at 488 (finding that "replacement within the protected class gives rise to an inference of non-discrimination" that the plaintiff must eliminate). Thus, Ms. Heggins has not established a prima facie case of discrimination.

---

[9] The elements of a § 1983 race discrimination claim are the same as for a Title VII race discrimination claim. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).

Even if Ms. Heggins did put forth a prima facie case, the City offers a legitimate, non-discriminatory reason that Ms. Heggins has not rebutted. The City shows with substantial evidence that Ms. Heggins engaged in a pattern of rude and inappropriate behavior triggered by her disagreement with the verbal warning given for distributing the flyer. Doc. 28-2 at 109 (memo documenting verbal warning for poor performance); Doc. 28-9 at 7-8 (memo documenting July verbal warning). She was suspended without pay in September 2015 after the City concluded that she continued to display disruptive behavior. Doc. 28-8 at 14 (suspension memo). Within hours of her return to work, she called the HR Director a liar, indicating to the City that her disruptive behavior would continue unless she was terminated. Doc. 28-8 at 16 (termination memo).

To prove that the City's reasons for firing her were pretextual, Ms. Heggins has offered only (1) her disagreement with the City's conclusions, and (2) several letters stating that she did not act inappropriately during the August 2015 Human Relations Commission meeting where she allegedly made derogatory comments about Mr. Demko. Both are insufficient to establish pretext. The issue is not whether the City's reasons for firing Ms. Heggins were correct. Instead, the issue is whether the City's reasons "were not its true reasons, but were a pretext for discrimination." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Courts are not "a kind of super-personnel department weighing the prudence of employment decisions." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016).

In other words, Ms. Heggins must prove "both that the reason was false and that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Wash.*

11

*Coll.*, 57 F.3d 369, 378 (4th Cir. 1995). Ms. Heggins offers no evidence suggesting that discrimination was the real reason for her discharge. There is no evidence that the City has been inconsistent in its explanations for her discharge, and it is undisputed that the City contemporaneously documented its concerns over her work performance. *Cf. Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 576 (4th Cir. 2015) (denying summary judgment when employer offered inconsistent explanations over time based on alleged but undocumented misconduct). She does not deny that her supervisors received complaints about her from a City Councilman, *see* Doc. 28-9 at ¶ 12, and that a Major in the City's police force reported concerns over Ms. Heggins' public statements about Mr. Demko and swastikas. Doc. 28-8 at ¶ 11; 28-8 at 11-12. The only evidence she offers undermining the City's proffered reason is her own opinion that her conduct was not disruptive or inappropriate, but an employee's disagreement with an employer's conclusions does not prove that the employer's explanation was dishonest or not the real reason for the termination. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). In short, Ms. Heggins has not offered evidence sufficient to show pretext.

Ms. Heggins has not established a prima facie case, nor has she raised a genuine factual dispute over the City's nondiscriminatory explanation. Summary judgment for the defendants on her discrimination claim is therefore appropriate.

III. **The Title VII Retaliation Claim**

Ms. Heggins also contends that the City retaliated against her for opposing unlawful employment practices, making charges of discrimination, and assisting in the

investigation of those charges. Doc. 18 at ¶ 42. According to Ms. Heggins, the retaliation began with a warning and escalated to termination.

To establish a prima facie case of retaliation under Title VII, she must show that (1) she engaged in a protected activity, (2) that the City took adverse employment action against her, and (3) that "a causal connection existed between the protected activity and the adverse action." *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). After making out a prima facie case, the burden shifting framework for retaliation and discriminatory treatment cases is the same. *See* discussion *supra* Part II. Additionally, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

Ms. Heggins has offered evidence sufficient to meet all three elements of a prima facie case. It is undisputed that Ms. Heggins engaged in a protected activity when she filed the May 2015 EEOC complaint. *See, e.g., Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656 (4th Cir. 1998) (filing a complaint with the EEOC is a protected activity).[10] Placing her on administrative leave in June 2015, warning her in July 2015, suspending her without pay in September 2015, and terminating her in October 2015, accompanied by a myriad of smaller indignities such as being left out of

---

[10] In her brief opposing summary judgment, Ms. Heggins contends that her "engagement in the Black & Blue forums which opposed racism in law enforcement work" was protected activity. Doc. 31 at 18. This is not a protected activity under Title VII, as the Forums were not directed toward any employment related practices, much less towards opposing discriminatory practices. *See Adams v. Giant Food, Inc.*, 225 F. Supp. 2d 600, 605 (D. Md. 2002).

communications with other department heads and being required to submit outgoing correspondence for the public information officer's approval, *e.g.*, Doc. 31-8 at ¶ 16(f),(g), taken together, constitute adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 73 (2006) (holding that materially adverse employment action is that which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination" and may include a suspension without pay).[11] She also has offered evidence to show causation, as only five weeks elapsed between Ms. Heggins' May 2015 EEOC charge and the City's decision to place her on administrative leave in June, a warning followed soon thereafter in July, she was suspended without pay in September, and she was terminated in October. The closeness in time between the initial protected conduct and the beginning of a course of conduct leading to adverse action would arguably support a factfinder's inference of causation.[12] *See Lettieri,* 478 F.3d at 651 (pattern of retaliatory conduct leading up to termination can show causation); *see generally Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that "very

---

[11]*See also Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) (indicating that reprimands may constitute materially adverse employment actions in some circumstances); *Cepada v. Bd. of Educ. of Baltimore Cty.,* 974 F. Supp. 2d 772, 788-89 (D. Md. 2013) (finding that administrative leave is a materially adverse action in a Title VII retaliation case); *but see Grice v. Baltimore Cty., Md.*, Civ. No. JFM 07-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008), *aff'd,* 354 F. App'x 742 (4th Cir. 2009) (placing employee on paid suspension not materially adverse because retaining salary and benefits prevented "serious hardship").

[12] The defendants have not contended that the City was unaware of the protected activity at this point. *See Dowe*, 145 F.3d at 657 (stating that the employer's knowledge that the plaintiff engaged in a protected activity is necessary to establish the causation element of the prima facie case); *see* Doc. 28-2 at 111 (memo from Ms. Heggins to investigator mentioning EEOC charge).

close" temporal proximity between employer's knowledge of the protected activity and the adverse action can be sufficient to establish causation).[13]

The City, however, has offered nondiscriminatory explanations for its actions that Ms. Heggins has not rebutted. It is undisputed that Ms. Heggins was placed on administrative leave in July in response to her own expressions of fear for her life and the life of a co-worker while at work, for her safety, and so that these fears could be investigated. Doc. 28-8 at ¶ 5; Doc. 28-7 at ¶ 6. Her co-worker was treated the same. Doc. 28-7 at ¶ 6. She returned to work with no loss of pay or benefits when the investigation was complete. Doc. 28-7 at ¶ 6.

Likewise, the City has put forward a legitimate, non-discriminatory reason for the July 27 warning. Ms. Heggins has not disputed that her actions in wearing and posting her own signs about discrimination were disruptive to the work environment and that several co-workers expressed discomfort with her actions. *See* Doc. 31-2 at 7.

The same is true for the suspension of Ms. Heggins in September 2015. It is undisputed that a city councilman complained that Ms. Heggins "confronted or harassed" him after a meeting, Doc. 28-9 at 7, and that a police officer reported that Ms. Heggins made questionable comments about the City Manager and swastikas. Doc. 28-8 at ¶ 11.

Finally, it is undisputed that within a day of returning to work from the suspension, Ms. Heggins called the Director of Human Resources a liar and argued with her in front of other human resources staff. Doc. 28-9 at ¶ 14; Doc. 28-5 at 8-10. The

---

[13] To the extent Ms. Heggins claims that the April 2015 warning was retaliatory, that claim fails, since the warning occurred before the protected activity in May.

City's internal documentation consistently supports its position that Ms. Heggins was terminated after she continued to engage in disruptive actions despite several warnings and a suspension. *E.g.,* Doc. 28-2 at 109 (memo documenting April warning); Doc. 31-2 at 7 (memo documenting July warning); Doc. 28-8 at 14 (suspension letter); Doc. 28-8 at 16 (termination letter); Doc. 28-9 at 7-8 (report on Ms. Heggins' work performance).

Ms. Heggins has not shown pretext for the same reasons explained *supra* in connection with her discrimination claim. Beyond her own opinion, she offers no evidence sufficient to prove that the City's explanations were not the real reasons for the various disciplinary actions taken, including termination. *See Jiminez*, 57 F.3d at 378.

Accordingly, summary judgment is appropriate as to this claim.

IV. **Conclusion**

Ms. Heggins has failed to offer evidence sufficient to create disputed questions of material facts as to her Title VII and § 1983 race discrimination and retaliation claims. As to her First Amendment claim, the undisputed evidence shows that she was not speaking in a capacity as a private citizen but rather as an employee, so that under *Garcetti* her claim must be dismissed. The Court concludes that summary judgment is appropriate as to all claims.

It is **ORDERED** that the defendants' motion for summary judgment, Doc. 27, is **GRANTED.** Judgement will be entered separately.

This the 20th day of December, 2017.

_____
UNITED STATES DISTRICT JUDGE